

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PFIZER INC., ) | |
| PFIZER IRELAND PHARMACEUTICALS ) | |
| WARNER-LAMBERT COMPANY, and ) | |
| WARNER-LAMBERT COMPANY, LLC, ) | |
| ) | |
| Plaintiffs, ) | Case No. 08 C 7231 |
| ) | |
| v. ) | Judge Robert M. Dow |
| ) | |
| APOTEX INC., and ) | Magistrate Judge |
| APOTEX CORP., ) | Martin C. Ashman |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, including Pfizer Inc. ("Pfizer"), sued Apotex Inc. and Apotex Corp. (collectively "Apotex") for patent infringement. Currently before this Court is Apotex Inc. and Apotex Corp.'s Motion to Compel Discovery ("Apotex's Motion" or "Motion"). The Court rules on this Motion under Judge Robert M. Dow's referral of this case for discovery supervision pursuant to N.D. Ill. R. 72.1. For the reasons stated below, the Court grants Apotex's Motion in part and denies it in part.

### I. Background

Pfizer owns the primary patent at issue in this Motion, U.S. Reissue patent No. Re 40,667 ("the '667 patent"). Pfizer uses the '667 patent to produce Lipitor®, a drug containing atorvastatin calcium that doctors prescribe to treat cardiovascular disease and prevent hypercholesterolemia

(and attendant heart attacks and stroke). (Pls.' Mem. in Opp'n to Apotex Inc. and Apotex Corp.'s Motion to Compel Discovery ("Pls.' Opp'n") 2.) The Federal Drug Administration approved Lipitor® in 1996, and Pfizer began selling it in 1997. (*Id.*) Although Lipitor® brought in huge revenues, Pfizer's corporate blood pressure began to rise around August 19, 2002, when Ranbaxy, a generic drug company, filed the first Abbreviated New Drug Application ("ANDA").

In 1984, Congress created the ANDA process—which was designed as an expedited approval process for generic drugs—under the Hatch-Waxman Act. *Janssen Pharmaceutica, N.V. v. Apotex, Inc.*, 540 F.3d 1353, 1355 n.1 (Fed. Cir. 2008) ("The Hatch-Waxman Act is the name commonly used to refer to the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified at 21 U.S.C. §§ 355, 360(cc) (2000), 35 U.S.C. §§ 156, 271, 282 (2000)), as amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003)."). The district judge in this case has explained the ANDA process at length, as well as the various applicable amendments to the Hatch-Waxman Act. *Pfizer Inc. v. Apotex Inc.*, 2010 WL 2649841, at *1–2 (N.D. Ill. June 30, 2010). Because the Court is trying to trim the factual fat, there is no need to repeat that analysis here.

To keep our finger on the legal pulse, however, there are a few key points to remember for the purposes of this Motion. First, a company seeking to market a generic form of a current drug on an expedited basis must file an ANDA to do so. *Id.* Second, the ANDA filer can file based on one of four categories. *Id.* Each of these relates to the status of the patents, if any, used in the drug that the ANDA filers seeks to market. *Id.* Third, the patent owner can sue the ANDA

filer for infringement. *Id.* Finally, the ANDA filer can bring a declaratory judgment action against the patent owner after filing if certain conditions are met. *Id.*

At bottom, the ANDA means that a new generic drug may enter the market. For that reason, Pfizer didn't take Ranbaxy's ANDA lightly; it sued Ranbaxy on two patents, which Pfizer in its brief dubs the '893 patent (now expired)[1] and the '995 patent.[2] (Pls.' Opp'n 2–3.) Although the United States District Court for the District of Delaware found both the '893 and '995 patents valid and infringed, the Federal Circuit on appeal found a technical defect in the sole asserted '995 claim. (Pls.' Opp'n 3 (citing *Pfizer Inc. v. Ranbaxy Labs Ltd.*, 405 F. Supp. 2d 495 (D. Del. 2005), *affirmed in part*, 457 F.3d 1284 (Fed. Cir. 2006).) As a result, Pfizer obtained a reissue patent of the '995 patent, which took the form of the disputed '667 patent in this case. (Pls.' Opp'n 3.) Another dispute with Ranbaxy arose with respect to a Pfizer drug called Caduet®, which, like Lipitor®, was used for hypertension and hyperlipidemia. (*Id.* at 3.) Again, Pfizer sued Ranbaxy for patent infringement. (*Id.*) Later, on June 18, 2008, Pfizer and Ranbaxy issued a press release stating they had settled their disputes, including those involving Lipitor® and Caduet®. (*Id.*)

Although the settlement brought temporary relief, Pfizer's legal arteries soon began to clog again, as two more companies filed ANDAs. (*Id.* at 4.) Although these lawsuits settled, more ANDA filers followed, including Apotex. (*Id.* at 4.) Originally, Pfizer sued Apotex for infringement and sought a permanent injunction, though Apotex has since counterclaimed on invalidity grounds. In the course of discovery, the parties have filed a variety of motions. That

---

[1] This is U.S. Patent No. 4,681,893, which expired on March 24, 2010. (Defs.' Mot. 2, 7.)

[2] U.S. Patent No. 5,273,995. (Defs.' Mot. 10.)

brings us to our current dispute, which concerns documents Apotex seeks in its discovery requests:

> REQUEST NO. 114: Any and all documents and things relating to generic competition or potential competition for LIPITOR® or to preventing generic entry of LIPITOR® on to the U.S. market.
>
> REQUEST NO. 115: Any and all documents and things relating to "Life Cycle Management" of LIPITOR®.
>
> \* \* \* \*
>
> REQUEST NO. 122: All documents and things regarding any authorized generic entry agreements, licenses and/or contracts [Pfizer] have entered into with any other drugs [that] are subject to a patent challenge.
>
> \* \* \* \*
>
> REQUEST NO. 123: All documents and things regarding any agreements, licenses and/or contracts relating to any agreement reached between Plaintiffs and any third-party regarding the marketing of generic versions of Plaintiffs' atorvastatin products, including but not limited to any authorized generic entry agreement.

(Defs.' Mot., Ex. C at 27–29.) These requests are the heart of the disputed Motion. Pfizer filed various objections to these documents. Apotex filed this Motion because the parties could not resolve their differences of opinion regarding these documents.

## II. Discussion

Because this is a discovery dispute, the parties argue about two main discovery-related issues: relevance and privilege. The Court will address them in that order.

- 4 -

### A. Relevance

Apotex essentially seeks two types of documents: (1) settlement agreements—and documents related to these agreements—between Pfizer and other companies relating to Lipitor® ("the settlement documents"), and (2) documents regarding Pfizer's business plans when generic drugs enter the market ("the generic entry documents"). These latter documents include "market share projections, strategy plans, life-cycle plans, and documents reflecting any anticipated reaction by Pfizer to generic entry." (Defs.' Mot. 13–14.) Since the law governing relevance is the same for both categories of documents, the Court first explains the law and then analyzes each category of document.

Under the Federal Rules of Civil Procedure, discovery is broad. FED. R. CIV. P. 26(b). Parties can seek nonprivileged information that is relevant to its claims or defenses. *Id.* "Relevant information" is that which is "reasonably calculated to lead to the discovery of admissible evidence." *Id.*

#### 1. The Settlement Documents

Apotex offers three reasons the settlement documents are relevant. These arguments relate to legal issues of secondary considerations, patent misuse, and a pending motion.

##### i. Secondary Considerations

Apotex makes two arguments that the documents are relevant to secondary considerations of nonobviousness, which go to the validity of the '667 patent. (Defs.' Mot. 7.) Before reaching those arguments, the Court notes that secondary considerations are "the circumstances . . .

preced[ing], attend[ing], and succeed[ing] the appearance of the invention." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294 (Fed. Cir. 2010) (quoting *Safety Car Heating & Lighting Co. v. Gen. Elec. Co.*, 155 F.2d 937, 939 (2d Cir.1946) (L. Hand, J.)). "Relevant secondary considerations include[] commercial success, long-felt but unsolved needs, failure of others, and the presence of a motivation to combine, or avoid combining, prior art teachings." *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1351 (Fed. Cir. 2010) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007)). Courts must consider these facts, if presented, when determining whether a patent is invalid on obviousness grounds. *TriMed, Inc. v. Stryker Corp.*, No. 2007-1059, — F.3d —, 2010 WL 2292312, at *4, 7 (Fed. Cir. June 9, 2010). Additionally, the patentee "must show a 'nexus between the merits of the claimed invention and evidence of secondary considerations . . . for the evidence to be given substantial weight in an obviousness decision.'" *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1374 (Fed. Cir. 2010) (quoting *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 (Fed. Cir. 2008)).

On to the arguments.

First, Apotex points to a potential licensing agreement between Pfizer and Ranbaxy (or other settling parties) to make but not market atorvastatin, which could be used to rebut Apotex's claim of obviousness (Defs.' Mot. 7.) Pfizer responds that the documents Apotex seeks are irrelevant because it has never committed itself to relying, and will not rely, on licensing the '667 patent as a secondary consideration. (Pls.' Opp'n 5–6.)

Regardless of whether Pfizer will rely on any potential licensing agreement reached in a settlement, the licensing agreements (as contained in the settlements) are relevant.[3] The documents may indicate the '667 patent is nonobvious, despite Pfizer's insistence that it will not rely on the license to show this fact.

Second, Apotex contends that the settlement documents are relevant to commercial success of Lipitor®, which Pfizer may rely on to rebut the obviousness argument. (*Id.* at 8.) Pfizer claims these documents are irrelevant because it already showed, and intends to rely on, Lipitor's® past commercial success. (Pls.' Opp'n 6.)

Commercial success of a product is evidence that the patent used in the product is nonobvious. But not just any commercial success will do: the patentee must tie the commercial success to the patent at issue beyond what was readily available in the prior art. *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) (quoting *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir.1997)).

It's for this reason that Pfizer's reliance on Lipitor's® past commercial success cannot render these documents irrelevant. The question of commercial success requires Pfizer to link the commercial success to the '667 patent. Apotex's theory is that previous commercial success is tied to Pfizer's since-expired '893 patent, which it asserts was a patent integral to the Pfizer's settlement with Ranbaxy. Apotex hopes that's the case so it can argue the commercial success was not tied to the '667 patent, thus demonstrating that the '667 patent was obvious. Of course, it

---

[3] As explained below, the request(s) seeking the settlement documents is overbroad and therefore cannot include the documents relating to the settlement, only the settlement agreements themselves.

has no way of knowing any of this without these settlement documents. These are precisely the kind of documents that discovery permits Apotex to demand and receive.

      ii.  Patent Misuse

Next, Apotex argues that settlement agreements may show patent misuse. (Defs.' Mot. 9.) Pfizer contends that Apotex's patent misuse claim is speculative, and that the Ranbaxy's press release shows that no patent misuse existed. (*Id.* at 9–10.)

Patent misuse is a defense to claims of infringement, which, if successful, renders a patent unenforceable until the misuse is "purged." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998). "Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant." *Id.* In other words, patent misuse is concerned with patentees who, using the limited rights the Patent Act grants them, enlarge or expand those rights to create an anticompetitive effect. *Id.* ("The key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect.").

At this juncture, Apotex doesn't seek to prove patent misuse; it, instead, wants to see if can develop that defense with the requested documents. It wants, for instance, to see if Pfizer induced Ranbaxy to settle by threatening an infringement claim based on the reissuing '667 patent. It also suggests that three other later-expiring Lipitor® patents may have been used for this purpose. Under the broad discovery rules, it is entitled to these documents. Pfizer cannot merely assert that no patent misuse occurred and direct Apotex to publicly available documents and

- 8 -

press releases to confirm that. Apotex needn't take Pfizer's or Ranbaxy's word on whether Pfizer misused a patent. No sane defendant would. Because the settlement documents may be relevant to patent misuse, they are discoverable.

### iii. Pending Motion for Reconsideration

Finally, Apotex contends that information contained in the settlement documents could be relevant to a pending motion for reconsideration of the district judge's order dismissing several other patents. (*Id.* at 11.) But the district judge has decided this issue, making it the law of the case. The court cannot at this stage accept Apotex's argument that, if Pfizer appeals, then this issue becomes relevant. Until that appeal actually happens, this fact can't provide a basis for relevance. This argument is immaterial, though, as the Court already has found these documents relevant on other grounds.

### 2. The Generic Entry Documents

Apotex also argues that it is entitled to documents concerning Pfizer's business plans should a generic drug reach the market. These documents, Apotex argues, are relevant to whether Pfizer would suffer irreparable harm if no injunction issued against Apotex. Pfizer has two replies. The first relates to whether it must show irreparable harm. The second relates to relevance.

### i. Irreparable Harm

First, Pfizer claims that it need not prove irreparable harm for an injunction to issue. (Pls.' Opp'n 13.) Pfizer claims that *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)—which held that permanent injunctions cannot issue automatically after a finding of infringement—does not apply here. In other words, Pfizer need not show it suffered irreparable harm for an injunction to issue. (*Id.*) Pfizer's argument is premised on the fact that the Patent Act contains ANDA-specific provisions. (*Id.*)

Under the Patent Act, courts may issue injunctions upon a finding of infringement. 35 U.S.C. § 283. In *eBay*, the Supreme Court held that courts must evaluate four factors—irreparable harm, inadequate remedy at law, balance of hardships, and public interest—prior to granting injunctions. 547 U.S. at 393–94. In other words, a court could not automatically issue permanent injunctions after it made a finding of patent infringement. *Id.*

Although § 283 typically governs injunctions in patent cases, there are exceptions. Where ANDAs are at issue, for example, the Patent Act has separate provisions for both infringement and remedies for acts of infringement. 35 U.S.C. § 271(e)(2) (stating acts of infringement); 35 U.S.C. § 271(e)(4) (stating remedies for infringement under § 271(e)(2)). The two relevant ANDA provisions for this case are §§ 271(e)(4)(A), 271(e)(4)(B). Both of these provisions are concerned with what happens after the court finds infringement—i.e., with remedies. The former provision states: "[T]he court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed . . . ." 35 U.S.C. § 271(e)(4)(A) The latter provision is concerned with injunctions: "[I]njunctive relief may be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United

States or importation into the United States of an approved drug or veterinary biological product . . . ." 35 U.S.C. § 271(e)(4)(B).

When read together, these provisions do not, as Pfizer suggests, "effectively award the successful patentee in an ANDA case an automatic permanent injunction that prevents the commercial sale of the ANDA product until after the expiration of the patents(s) in suit."[4] (Pls.' Opp'n 13.) The plain language of these provisions prohibits such a result. The statute makes clear that § 271(e)(2)(B) governs injunctions in the ANDA context. Section 271(e)(2)(A), on the other hand, governs the *date of approval* a court orders for an infringing drug after finding infringement. This latter provision is additional relief available beyond an injunction. *See* H.R. REP. NO. 98-857, pt. 1, at 46 (1984), U.S. Code Cong. & Admin. News 1974, pp. 2647, 2679 ("If the infringing party has begun commercial marketing of the drug, damages, and other monetary relief and injunctive may be awarded for the infringement and to prevent further infringement. *In addition, the FDA would be mandated to change the effective date of the approved ANDA to the expiration of the infringed patent.*") (emphasis added); *id.* ("If the infringing party has not begun commercial marketing of the drug, injunctive relief may be granted to prevent any commercial activity with the drug *and the FDA would be mandated to make the effective date of any approved ANDA not earlier than the expiration date of the infringed patent.*") (emphasis added).

Additionally, § 271(e)(4)(B), like § 283, states that courts *may grant* injunctions against the infringer to prevent the defendant from doing various things, including selling the drug or

---

[4] To be clear, the court notes that § 271(e)(4)(A) requires that the court order the date of approval "not earlier than the date of expiration of the patent which has been infringed." It doesn't require the court to set the approval date for the exact day the patent expires. *See AstraZeneca AB v. Impax Labs., Inc.*, 490 F. Supp. 2d 368, 376–77 (S.D.N.Y. 2007).

product at issue. Section 271(e)(4)(A), on the other hand, concerns the date of approval, not whether the injunction issues: it requires courts finding infringement to specifically order the approval date of the infringing drug to be after the patent's expiration. It would be curious, indeed, if the permissive language of the injunction provision were somehow superceded or trumped by the mandatory language of § 271(e)(4)(A), especially given *eBay*'s explicit command that injunctions not issue automatically after a finding of infringement.

The case that Pfizer cites supports, rather than contradicts, this conclusion. (Pls.' Opp'n 13 (citing *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 501 F.3d 1263 (Fed. Cir. 2007).) In *Forest Laboratories*, the court found that injunctions issued under 35 U.S.C. § 271(e)(4)(B) "may properly extend to the 'approved drug,' [but] should not extend to the remainder of the products covered by the patent." *Id.* at 1271–72. That conclusion, however, did not speak to § 271(e)(4)(A), or whether it should constitute its own provision for injunctive relief.

Pfizer's argument that this case makes "clear that §271(e)(4)(B) and § 283 are not the same" is true, but immaterial to the resolution of this issue. Of course these provisions are different—that is just an accurate description of the statute. The fact that these two provisions are dissimilar, however, doesn't mean that they are different in all respects. The main differences here lie in when and to what inventions these provisions apply. While § 283 is general in application, § 271(e)(4)(B) applies in specific cases, as noted above. More importantly, though, is that § 271(e)(4)(B) limits the *scope* of the injunction, not whether the injunction is governed by *eBay*. Indeed, nothing in the parties' briefs indicates that *eBay* should somehow fail to apply here. The bottom line is that §§ 271(e)(4)(A) and (B) are two different remedies. Because Pfizer seeks an injunction, it must deal with *eBay*'s command that it show irreparable harm.

ii.     Relevance

Despite losing the irreparable harm argument, Pfizer isn't through. Even if it must show irreparable harm for an injunction to issue, Pfizer argues that the generic entry documents are irrelevant. It claims that, although the documents concern its business strategy for generic entry onto the market, they do so only for the period *after* the '667 patent expires. (*Id.* at 14.) Therefore, it claims, these documents don't show what kind of harm it would suffer if generics entered the market during the life of the '667 patent. (*Id.*)

Pfizer's argument is misplaced. The generic entry documents are relevant to how much harm Pfizer would suffer if generic drugs entered the market. Although these documents concern a plan after the expiration of the '667 patent, they may still show how the entry of generic drugs affects the sale of Lipitor® and the use of the '667 patent. This is discovery, after all, and these documents are relevant to how much harm Pfizer might suffer if generics entered the market.

B.     **Settlement Privilege**

Although the Court has found both sets of documents relevant for discovery, Pfizer claims that it need not produce the settlement documents because they are protected by a "settlement privilege." (Pls.' Opp'n 6–8.) By "settlement privilege" Pfizer means that a privilege that protects the settlement agreement and the communications regarding that agreement. (*Id.*) For support, Pfizer cites *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 979–80 (6th Cir. 2003), *Steele v. Lincoln Fin. Group*, No. 05-7163, 2007 WL 1052495, at *4 (N.D. Ill. Apr. 3, 2007), and *Vardon Golf Co. v. BBMG Golf Ltd.*, 156 F.R.D. 641 (N.D. Ill. 1994).

- 13 -

Pfizer's reliance on these cases is not entirely misplaced, though they don't support as broad a privilege as Pfizer would like. First, the two cases from the Northern District of Illinois do not stand for the proposition that a settlement privilege exists. *Steele*—which Pfizer accurately quotes— simply recognized what other courts have found: "*statements made in the context of private or court[-]sponsored settlements or mediations* are immune from discovery, at least from third parties." 2007WL 1052495, at *4 (emphasis added). Ultimately, then, there are two problems with *Steele*. First, as Pfizer notes, it merely recognized that a privilege exists in other circuits. Second, and at least as important, is that the recognized privilege concerned *statements made* during settlement negotiations, not the settlement itself.

*Vardon*, like *Steele*, helps Pfizer, but not entirely. In that case, the plaintiff issued an interrogatory that sought "information relating to settlement negotiations." *Id.* at 651. In denying the plaintiff's motion to compel an answer to this interrogatory, the court noted that "[t]he policy favoring freely-negotiated settlements is one of the strongest in the federal courts, *and is enshrined in Fed. R. Evid. 408's* [("Rule 408")] *exclusionary rule*." 156 F.R.D. at 652 (emphasis added). Like the *Steele* court's discussion of the "settlement privilege," the *Vardon* court was addressing statements made in the context of settlement negotiations, not the settlement itself. *See* FED. R. EVID. 408(a)(1) ("Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction: . . . furnishing or offering or promising to furnish—or accepting or offering or promising to accept--a valuable consideration in compromising or attempting to compromise the claim.").

So *Steele* and *Vardon* are not evidence of a privilege preventing discovery of settlement agreements—instead they caution against discovery of settlement discussions. *Goodyear*, while decided in the Sixth Circuit, essentially says the same thing. 332 F.3d at 981–82 (holding a settlement privilege exists as to third-party discovery of settlement negotiations). Although it formally accepted the settlement privilege as to communications, it did not wholly cordon off all things settlement. *Id.* at 981–83 (recognizing exceptions in Rule 408 as applying to settlement agreements and the occurrence of settlement talks). Nor could it. As the Court explains below, Rule 408 provides for exceptions to the general rule against the admissibility of settlement negotiations. Thus, all three cases Pfizer cites—*Goodyear*, *Vardon*, and *Steele*—support the proposition that discussions in settlement negotiations are entitled to protections, not that the agreements themselves are privileged.

Pfizer also notes, correctly, that the Seventh Circuit in *In re General Motors Corp.*, 594 F.2d 1106 (7th Cir. 1979) did not affirmatively rule that a settlement privilege, as Pfizer describes it, exists. (Pls.' Opp'n 8–9 (discussing *In re General Motors Corp.*)) But it is not correct that the decision is wholly inapplicable. *In re General Motors Corp.* concerned a settled class action lawsuit. 594 F.2d at 1115–16. After the district court approved the settlement, several private counsel objected, and the court then held a fairness hearing. *Id.* at 116–17. At the hearing, the plaintiff-objectors sought discovery into the settlement negotiations to determine whether the settlement was fair, reasonable, and adequate. *Id.* at 1123. The district court denied their request, and the plaintiff-objectors appealed. *Id.* On appeal, the Seventh Circuit reversed the district court's ruling. *Id.* at 1141. The main part of the Seventh Circuit's opinion on which the parties focus is footnote twenty, which partially explained why "the conduct of the negotiations was

- 15 -

relevant to the fairness of the settlement and that the trial court's refusal to permit discovery or examination of the negotiations constituted an abuse of discretion." *Id.* at 1124 n.20. In this footnote, the court explained that Rule 408 "simply bars admission of evidence of compromise negotiations to prove liability or damages and expressly provides that it 'does not require exclusion when evidence is offered for another purpose.'" *Id.* (quoting FED. R. EVID. 408).

This footnote makes *In re General Motors* both relevant and distinguishable. It's relevant because it states that a court may admit into evidence settlement negotiations when those negotiations are not used to prove liability or damages. Rule 408 gives examples of such uses: "proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution."

But the footnote also is distinguishable: the court allowed discovery of settlement negotiations because the plaintiff-objectors—not third parties—were disputing the fairness of *that same* settlement (i.e., "another purpose" under Rule 408). Indeed, its decision was driven in large part from the trial court's duty to ensure that the class' attorneys fairly and adequately represented the class members' interests. *In re General Motors Corp.*, 594 F.2d at 1124. Thus, it doesn't mean that the law always permits discovery of settlement discussions; it just means that, when a party to a settlement agreement contests the settlement, the party may inquire as to the communications surrounding that contested settlement.

Here, Apotex seeks "[*a*]*ll documents and things regarding* any agreements, licenses and/or contracts relating to any agreement reached between Plaintiffs and any third-party regarding the marketing of generic versions of Plaintiffs' atorvastatin products, including but not

limited to any authorized generic entry agreement." (Defs.' Mot., Ex. C at 27-29 (emphasis added).) That request is overbroad. Although there is no settlement privilege as Pfizer describes it, the weight of authority bars Apotex from discovering documents relating to or created during settlement negotiations involving Pfizer and other parties. Further still, Apotex (a third party) doesn't want to use these documents to challenge the settlements they concern; Apotex wants to use these communications or documents to disprove liability, which Rule 408 prohibits. For these reasons, Apotex is entitled to the settlement agreements themselves, nothing more.

### III. Conclusion

For the aforementioned reasons, this Court grants Apotex's Motion in part and denies it in part. Apotex is entitled to the settlement agreements themselves, but not documents relating to the settlement agreement. Apotex also is entitled to the generic entry documents. Pfizer must produce these documents to Apotex within twenty-one (21) days.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: August 4, 2010.